# WASHINGTON RAILWAY & ELECTRIC COMPANY *v.* CULLEMBER.

NEGLIGENCE; DIRECTION OF VERDICT; STREET RAILWAYS; DAMAGES; TRIAL; WITHDRAWING TESTIMONY; HARMLESS ERROR.

1. Refusal to direct a verdict for the defendant, in an action for personal injuries, on the ground of plaintiff's contributory negligence, is not erroneous, where the evidence cannot be said to be so plain and conclusive that all reasonable minds could but come to the same conclusion.

2. A street railway company is liable for personal injuries sustained by one thrown from his wagon when it was struck by a car, although his own negligence may have exposed him to the risk of injury, if the motorman actually saw him, or could have seen him by the use of reasonable diligence, in time to stop the car. (Citing *Hawley* v. *Columbia R. Co.* 25 App. D. C. 1; *Capital Traction Co.* v. *Divver*, 33 App. D. C. 332; *Baltimore & O. R. Co.* v. *Griffith*, 34 App. D. C. 469; *Capital Traction Co.* v. *Apple*, 34 App. D. C. 559; *Capital Traction Co.* v. *Crump*, 35 App. D. C. 169.)

3. The question of permanent impairment of hearing as an element of damage, in an action for personal injuries, is properly submitted to the jury, where the plaintiff's testimony is corroborated to some extent by one physician and contradicted by another.

4. It would seem to be the duty of the party introducing evidence, which was admitted over the objection of the adverse party on condition that connecting evidence be presented, to ask, upon failure to offer such evidence, to withdraw the improper testimony, rather than to require the adverse party to renew his motion to exclude the evidence.

5. In an action for personal injuries, the admission of evidence, not justified by the allegations of the declaration, that plaintiff was not stoop shouldered before the injury "like he is now," is harmless error, when the court stated that the evidence was not to be considered relevant unless it should be shown by expert testimony that the condition was a result of the spinal injury alleged and proved,—this being emphasized by a special instruction,—and where the amount of the verdict indicates that the jury confined themselves to the elements of damage given in the charge.

No. 2417.   Submitted October 17, 1912.   Decided December 2, 1912.

HEARING on appeal by the defendant from a judgment of the Supreme Court of the District of Columbia on verdict in an action to recover damages for personal injuries.

*Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a judgment in an action of damages for personal injuries.

Plaintiff's declaration in two counts charged that while he was driving a street-sweeping wagon northeast along Rhode Island avenue in the city of Washington on August 12, 1909, his wagon came in collision with an electric street railway car at the intersection of Ninth street, through the negligence of defendant's agent controlling said car; and that he was thrown with great violence from his wagon, whereby he sustained severe injuries in his head, resulting in permanent injury to his hearing; and to his right hip, causing the rupture of a blood vessel; also that his spine was permanently injured, and his left arm and elbow sprained. Plaintiff testified that he was driving a wagon machine engaged in sweeping the street on Rhode Island avenue after nightfall on August 12, 1909, going northeast. There were four machines, two in front and one behind plaintiff. Two had crossed the Ninth street tracks of the defendant. Machine and tongue are about 17 feet long. A south-bound car passed before he got to Ninth street, and was probably between Q and P streets when he got to Ninth street. The car that hit his machine was coming up Ninth street from the south. When he got his machine wheels on the first track, the car was coming at such a rate he pulled his team around, because he knew that if he did not the car would strike the hind part of his machine. So he whipped the team up and very near got off the track before he was struck. When he first saw the car it was on the south side of Q street. The distance from the south line of Rhode Island avenue measures 148 feet; it was very light on Ninth street and he could see the car south of Q street. When he saw the car his mules were on the south-

bound car tracks; then he struck them and pulled them a bit, saw that this would throw the whole machine around on the track. His first impulse was to pull his team up the track, but seeing he could not clear it, he whipped up and tried to get across. The car was running faster than usual; thinks it was 12 to 15 miles an hour. The motorman rang no bell and gave no warning. Plaintiff was whipping his mules and looking at the motorman. The latter did not put his hand to the brake until he got within 4 or 5 feet. Motorman was looking through his window at plaintiff. Plaintiff was rendered unconscious by the collision. Is fifty-two years old. Hearing was pretty good before; now he can hear with his right ear pretty well, but nothing with his left. Was not lame before; is lame now. Cross-examined, he said, when he saw the car it had not crossed Q street, and he was then crossing the south-bound track. He pulled the mules and that threw the whole machine on the track. His front wheels were near the first rail of north-bound track or on the slot. The mules were almost over the track. Dr. Hilton, a witness for plaintiff, was standing on his porch on the north side of Rhode Island avenue, about 100 yards from the place of the accident. There were three sweepers moving in a walk about 6 or 7 feet apart. One had crossed Ninth street, and plaintiff's machine was following. The car was just past Q street when he first saw it. It was running between 10 and 12 miles an hour. Heard no bell rung. It was a bright night; electric lights on Ninth street brilliant. There was nothing to obstruct the motorman's view. The car struck the machine near the rear wheels with a loud crash. Cross-examined, he said that he remembered no car going south about that time. There was nothing to obstruct the view. Saw the coming car at the north line of Q street. The first sweeper had just crossed the east track and plaintiff's machine was on the other. Witness was watching, expecting a crash. Neither wagon nor car changed speed. A witness for plaintiff testified that it was his work to sweep up the piles pushed into the gutter, and he was waiting for plaintiff, who was next the gutter, to pass. Was sitting on the corner of the avenue and Ninth street. There were

three sweeping machines, and plaintiff drove the last one. When he first saw the car it was coming down grade between P and Q street, running faster than usual; 12 or 13 miles an hour. It rang no bell and made no check. Motorman made no effort to stop the car before he struck the wagon. Plaintiff was whipping his mules and doing all he could to get away before the car came. When the car passed Q street, the machine was just about coming on the south-bound track. Mules were going pretty well; not walking. Just about the time plaintiff got over the south-bound track the car was there and hit his rear wheels. Saw plaintiff when he was picked up. Seemed to be hurt about legs and back, and suffering very much. Witness was then asked if plaintiff was stoop shouldered before the accident "like he is now." Witness said he was not. Defendant objected because there was no allegation of injury to the shoulders, and moved to strike out the evidence. Plaintiff's attorney, admitting there was no direct allegation of such injury, contended that the injury to the spine would necessarily make the shoulders stoop. The court ruled that if this be connected with the injury to the spine, it would be admissible; but that this could only be done by expert evidence. Defendant reserved his exception for the time being.

Cross-examined, said that the second sweeper had cleared Ninth street before plaintiff came on. The car attracted witness's attention near P street, and when it did not stop at Q street and plaintiff was coming on, he thought there would be an accident. Motorman did not slacken speed until he hit the wagon. At that moment he commenced to wind his brake, and did not have it down until after he struck. There was good light and nothing to keep him from seeing the wagon. Plaintiff could see the car plainly when he was on the south-bound track, and the motorman could see the wagon. As the car crossed Q street the mules were about middle way of the four rails and the wagon was somewhere on the south-bound track. Plaintiff made an effort to pull the mules north, but he turned them and went on across. His hind wheels were about the middle of the track when the car struck them. He seemed to make them turn,

but witness supposes he saw he would be struck anyhow if he did, which was the way it appeared to witness. The driver of the wagon next in front of plaintiff testified that at the time of the accident witness's wagon was even with the east building line of Ninth street, and plaintiff's team was about 5 feet behind his broom. When witness first saw the car it was at the south side of Q street, and he thought it was going to stop. Witness had then cleared the north-bound track; and plaintiff ought to have been on the track; but witness did not then see him. Did not look back just at that time. Plaintiff's general appearance before the accident was about the same as it is now. Never observed any lameness in plaintiff before the accident and never heard him complain of deafness.

Dr. Taylor, a surgeon, testified that in company with Dr. Wellington, defendant's surgeon, he examined plaintiff about ten days before the trial. The trial was had some months more than two years after the accident. Plaintiff gave a history of his injuries; said he was made unconscious by the collision; was taken to the hospital, suffering great pain; had a large lump on one buttock, which the hospital surgeon told him was a blood clot caused by the breaking of a blood vessel; that he was deaf in one ear, had a continual pain in the lower part of his back and hip, and was unable to walk as formerly. Witness examined him and he appeared to be deaf in one ear, but witness did not care to testify on that line as he is not an aurist. Measurements of the leg showed no change in length; but in the middle of thigh the diameter of one leg is $1\frac{1}{2}$ inches greater than the other. Witness can only account for the lameness of plaintiff on the supposition that the scar tissue binds the muscles together so they cannot slide over each other; are interfered with mechanically as they contract and relax. The scar tissues and formations tie muscle around nerve, pulling the nerve and causing pain every time the muscle contracts. The formation of scar tissue is always the result of such an injury, and plaintiff's condition in that respect is permanent. Does not think plaintiff will get lamer; sees no reason for thinking that any change will take place after this length of time. Thinks his

condition will remain in the same as it is now. Cross-examined, witness said plaintiff heard him and Dr. Wellington perfectly well with the ear he called sound, and apparently could not hear with the ear he claimed to be unsound. Witness could not tell which ear it was; when plaintiff had one ear shut he could not hear,—at least, said he could not,—but with both ears open he could hear as well as any ordinary man. For defendant, Dr. Wellington testified to examination of plaintiff with Dr. Taylor. Plaintiff heard ordinary conversation across the room without difficulty. Plaintiff claimed he could hear' nothing with his better ear stopped, but in conversation he heard them "perfectly distinctly," and when both ears were unstopped he heard perfectly well. Witness had noticed the low tone of voice in which witness had been cross-examined, and certainly thinks there is no serious impairment of the hearing of either ear,—"a very slight impairment if any."

The motorman testified that the sweeper was coming east on Rhode Island avenue, and his car was going north on Ninth street. Was ringing bell. Another car was going south, and the sweeper came right in behind it and right across the track. Witness's car stopped on south side of Q street to let off passengers. From that point to the place of collision the car was going 5 or 6 miles an hour. First saw the plaintiff coming right out behind the south-bound car, stepping over on to the north-bound track. Witness was then 10 or 12 feet away, immediately applied the brakes, reversed the car, and sounded the gong; had sounded gong before he saw plaintiff, because it was a street intersection and meeting a car. Did everything in his power to stop the car when he saw the team on the track. Ran 4 or 5 feet after striking the wagon before the car stopped. Cross-examined, he said it was not very bright, but light enough to see what was on the track. When he left Q street the track ahead was perfectly clear. Did not see any other street sweeper. Was 10 or 15 feet from sweeper when he first saw it. The mules were stepping over the west rail. Driver was whipping up, trying to get across; mules were going between a walk and a trot. Several passengers corroborated the motorman as to

stopping at Q street, the speed of the car, sounding of gong be-
fore striking, and stopping of the car within a few feet. An-
other witness testified to meeting the south-bound car, the
plaintiff coming immediately behind it. Heard the gong
sound at that time, the brake wound, and the car reversed. De-
fendant's track foreman testified that he was standing with the
last witness on the front platform of car. Car stopped at Q
street, started from there at not more than 6 miles an hour.
Saw sweeper drive out behind south-bound car not more than
30 or 35 feet away. The motorman tried to stop the car.
Acted immediately, reversed, put on brake, and sounded gong.
Plaintiff was urging his team across.

Plaintiff and his witnesses had seen no such south-bound
car at the time. Defendant had endeavored to locate the crew
of the south-bound car, but had found it impossible to deter-
mine the particular car.

Upon the whole evidence, of which the foregoing is the sub-
stance, the case was submitted to the jury with a charge to
which exceptions were taken, and resulted in a verdict for plain-
tiff for $3,000, from a judgment upon which defendant has
appealed.

*Mr. C. A. Douglas* and *Mr. W. C. Sullivan* for the ap-
pellant.

*Mr. W. Gwynn Gardiner* and *Mr. R. J. Whiteford* for the ap-
pellee.

Mr. Chief Justice SHEPARD delivered the opinion of the
Court:

In accordance with the usual practice in damage suits of
the kind, defendant requested an instruction upon the close of
the evidence to return a verdict. This has necessitated the
somewhat lengthy statement that has been made of the substance
of the evidence. It is sufficient to say that, with the application
of the principles of law defined in the charge to the evidence,

there was no error in refusing to direct a verdict for defendant. Bearing in mind the applicable principles of law, it cannot be said that the evidence of plaintiff's contributory negligence was so plain and conclusive that all reasonable minds could but come to the same conclusion.

Several assignments of error founded on exceptions taken to special instructions given and refused, and the general charge, will be considered together, as they present substantially the same question. This is presented by the modification made of the second special instruction asked by defendant before it was given to the jury. This instruction, as asked, was to the effect that it was the duty of plaintiff in crossing that part of the street along which he knew the defendant's cars were accustomed to pass, to exercise reasonable care for his own safety; and that if the jury believed that plaintiff did not exercise the care for his safety that a reasonably prudent man would exercise under the circumstances, and that his failure to do so directly contributed to the injury, it was their duty to return a verdict for the defendant. The court gave the instruction, with the following modification: "That of course is to be taken in connection with the fact that if plaintiff had gotten upon the track at the time when defendant's motorman either did see him, or could have seen him by the use of reasonable diligence, and could have stopped the car, then it was the duty of the motorman to stop the car when he saw the obvious danger the plaintiff was in." The defendant excepted to so much of the modification as "told the jury it was the duty of the motorman to stop the car not only if he saw the plaintiff had gotten on the track, but could have seen him by the use of reasonable diligence." The same alleged error was committed in other parts of the charge that were duly excepted to.

It is a settled principle of law that, notwithstanding the plaintiff's own negligence may have exposed him to the risk of injury, he may nevertheless recover if the defendant's negligence, after becoming aware of the plaintiff's danger, was directly responsible for that injury. *Capital Traction Co.* v. *Divver,* 33 App. D. C. 332–336; and cases there cited; *Balti-*

*more & O. R. Co.* v. *Griffith,* 34 App. D. C. 469.   The con-
tention on behalf of appellant is that in the application of this
principle it is essential that the defendant shall have been
actually aware of, that is to say, shall have actually seen the
danger of the plaintiff in time to prevent injury by the exer-
cise of reasonable care; and it is not sufficient merely that the
defendant, as stated in the modification of the charge, could
have seen him by the use of reasonable diligence "in time to
stop the car."   Granting for the purpose of the argument that
this may be the correct application of the rule in the case of
steam railway trains crossing public highways, it does not
necessarily follow that it extends to the operation of street
cars in the streets of cities and towns.   "It is common knowl-
edge that the conditions attending the operation of ordinary
steam railways across country highways, and even city streets,
and those attending the running of electric cars along the
streets of an ordinary city, are essentially different.   The form-
er run at considerable intervals, have much longer and heavier
trains, and are not easily brought to a stop.   The latter run
with frequency—car following car—in rapid succession,—are
always in more or less crowded streets, and can be stopped
quickly.   The exigencies of daily traffic and the needs and con-
veniences of individuals result in constant crossing of street
railway tracks, both at and between street crossings.   Know-
ing this, those engaged in running the street cars are under a
duty to exercise ordinary care to prevent running over vehicles
and pedestrians.   These latter must also exercise due care in
looking out for coming cars, and must not recklessly expose
themselves to danger.   No fixed rule can be laid down for the
government of every case that arises.   What is due care must
depend upon the circumstances of the particular case."   *Capi-
tal Traction Co.* v. *Apple,* 34 App. D. C. 559–569.   In the same
case, which was one of a party run down in crossing the street,
it was also said (p. 571):   "Aside from the duty imposed by
law not to exceed a certain rate of speed, it is the duty of the car
operator to keep a diligent look out ahead so that the car may be
stopped in time, if possible, to avoid injury to one who may

be crossing ahead of him." The particular point under dis-
cussion was not directly presented in that case, but was inci-
dentally involved and under consideration. See also *Capital
Traction Co.* v. *Crump*, 35 App. D. C. 169–183, in a concur-
ring opinion in which Mr. Justice Van Orsdel, referring to
the *Apple Case,* said: "There was also evidence tending to
show that the motorman was negligent in not giving warning by
the sounding of the gong, and in not stopping or attempting to
stop his car, when, by the exercise of reasonable care, he could
have discovered the perilous position of the plaintiff." The
expressions in the opinions quoted from follow the doctrine of
the case of *Hawley* v. *Columbia R. Co.* 25 App. D. C. 1–5.
That was a case where a man had been struck by a car at the
intersection of Fourteenth street and New York avenue. Mr.
Justice Morris, who delivered the opinion of the court, said:
"Here the motorman of the defendant company had ample op-
portunity to guard against the accident if he had been using
even ordinary care and prudence and attending to the proper
performance of his duty. * * * At one of the most dan-
gerous crossings in the city of Washington he was not looking
ahead as he should have looked, and he had abandoned all con-
trol both of the controller and of the brake of the car." The
contention of the appellant that the foregoing case has been
overruled by the Supreme Court of the United States in *Chunn*
v. *City & Suburban R. Co.* 207 U. S. 302, 52 L. ed. 219, 28
Sup. Ct. Rep. 63, is untenable. If any inference is to be de-
duced from the opinion in that case it is to the contrary. The
decision of this court, that the plaintiff had been guilty of con-
tributory negligence, was reversed, but the Supreme Court
agreed that there was evidence of defendant's negligence suf-
ficient to warrant submission to the jury. Plaintiff was stand-
ing in a space between the tracks, at a place where passengers
usually boarded the car bound to Washington. The car coming
from the city ran rapidly by and struck plaintiff. There was
no evidence that the motorman saw the plaintiff in time to stop
his car; but as stated by the Court: "One standing on the plat-
form at this point could see or be seen for a distance of at

least a quarter of a mile north or south. On the evening of September 29, 1900, the plaintiff came to this place to take the car for Washington. The hour was not stated, but it was light enough to recognize a person a hundred yards away." *Washington & G. R. Co.* v. *Harmon* (*Washington & G. R. Co.* v. *Tobriner*) 147 U. S. 571, 37 L. ed. 284, 13 Sup. Ct. Rep. 557, is not in point. It was the case of a passenger injured by negligent starting of the car as he was in the act of getting off. The rights and duties of railway companies and of individuals traversing the streets of the city are reciprocal. Each must recognize the rights of others and exercise reasonable care to avoid inflicting or receiving injury. Appellant's contention that plaintiff was guilty of contributory negligence, as matter of law, rests upon the proposition that under the evidence he could and should have seen the coming car before attempting to cross the tracks. It was likewise the duty of the motorman to see that which he could have seen if exercising ordinary care. Knowing that vehicles must frequently cross the car tracks, it was his duty not only to his passengers, whose safety might be endangered by collisions, but to the general public, to run his car within the rate of speed prescribed by law, to keep a look out ahead of him, to keep his car under reasonable control, and to stop the same if reasonably possible in time to avoid injury to one who, even by his own negligence, had exposed himself to danger. The conditions of modern city life make this a reasonable rule of sound public policy looking to the preservation of the public safety. The evidence tended to show that the motorman, if exercising reasonable care, could have seen the danger of the plaintiff in time to have stopped his car, if under proper control, and avoided the collision. There was no error in the modification of the charge which submitted this question to the jury. Without setting out the assignments of error based on the charge relating to contributory negligence on the part of the plaintiff, it is sufficient to say that this was correctly stated both in the modified instruction and the general charge.

Another assignment of error is on an exception taken to so much of the charge as submitted to the consideration of the

jury, as an element of damage, the question of the permanent
impairment of plaintiff's hearing.   We perceive no error in
this.   Plaintiff's testimony tended to show that he had good
hearing in each ear before the injury; that the hearing in one
had been impaired, if not destroyed, by reason of his injuries;
and that this condition had continued during the more than
two years which had elapsed before the trial.   This was to
some extent corroborated by Dr. Taylor and contradicted by
Dr. Wellington.   The credibility of the witnesses and the weight
of the evidence were for the consideration and determination of
the jury.

The last assignment of error is on exception taken to the
evidence that plaintiff was not stoop shouldered before the
injury "like he is now."   As appears from the recital in the
statement of the case, defendant objected to this evidence be-
cause there was no such injury alleged in the declaration.   The
court ruled that it was admissible if it could be shown by expert
testimony that this was a result of the spinal injury alleged
and proved.   Counsel for defendant was allowed his exception.
No attempt was subsequently made by plaintiff to show that the
condition testified to was the consequence of the spinal injury,
nor was the objectionable evidence withdrawn.   Counsel for de-
fendant did not afterwards move to exclude it.

The evidence was not justified by the allegations of the
declaration which particularly described the injuries on which
the claim for damages was founded.   The contention of plaintiff
is that it was the duty of the defendant to move to exclude
the evidence upon the failure of plaintiff to offer the necessary
connecting evidence required by the Court.   Many cases are
cited in support of the contention.   *O'Brien* v. *Keefe,* 175
Mass. 274–278, 56 N. E. 588; *Bayliss* v. *Cockroft,* 81 N. Y.
363–370; *Hard* v. *Achley,* 117 N. Y. 606–617, 23 N. E. 177;
*Dorn* v. *Cooper,* 139 Iowa, 742–746, 117 N. W. 1, 118 N. W.
35, 16 Ann. Cas. 744; *Thomas* v. *State,* 129 Ga. 419–421, 59
S. E. 246; *Galveston, H. & S. A. R. Co.* v. *Janert,* 49 Tex.
Civ. App. 17, 107 S. W. 963.   Those cases do not appear to be
directly in point.   In some of them evidence was offered with

the statement that its relevancy would be shown by further evidence, and so received, subject to a motion to exclude upon failure. In others it is not clear that exceptions had been reserved at the time, though such may have been the case. In the absence of direct controlling or strong persuasive authority, we would not be inclined to hold that it was the duty of the defendant under the circumstances of this case to renew his motion to exclude the evidence. The evidence was not received subject to defendant's motion to exclude, but subject to his objection and with his exception noted. It would seem more just and reasonable under those circumstances to make it the duty of the party committing the error to avoid the consequences by asking to withdraw or exclude the improper testimony. We do not now find it necessary to decide the question. Assuming that defendant's exception was well taken and that his duty ended therewith, we are of the opinion that the error was a harmless one that would not warrant a reversal of the judgment. We must presume that the jury was composed of men of average intelligence and sense of duty. They must have understood from the remarks of the court that the evidence was not to be considered relevant unless it should be shown by expert testimony that the condition was the result of the spinal injury. This was emphasized by the special instruction given at request of plaintiff, and by the court's own charge, which expressly limited the recovery of damages for permanent injuries "to his limb, and to his hearing in the future, and the loss of partial use of such limb." The amount of the verdict indicates that the jury confined themselves to the elements given in the charge.

Satisfied from all the circumstances that no possible harm was sustained by the defendant by the ill-advised offer of the evidence objected to, the judgment ought not to be reversed.

It will, therefore, be affirmed, with costs.        *Affirmed.*